# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JEVON D. JACKSON,

        Plaintiff,

v.                                          Case No. 07-C-919

GARY ANKARLO, DEBORAH FISCHER,
MICHAEL THURMER, CAPTAIN PALTZ,
LT. BRAEMER, LT. GREFF, CAPTAIN CORE,
OFFICER STANIEC, OFFICER MEDEMA,
and OFFICER MASON,

        Defendants.

# ORDER

The plaintiff, a Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and paid the full filing fee. He is proceeding on an Eighth Amendment claim based on allegations that he was subjected to cold cell temperatures while incarcerated at the Waupun Correctional Institution. The defendants have filed a motion for summary judgment which will be addressed herein.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*,

763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving part." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, ... upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

# FACTS[1]

The plaintiff was incarcerated at the Waupun Correctional Institution (WCI) at all times relevant to this action. (DFOF ¶ 1). Defendant Deborah Fischer was employed as a Psychological Associate at WCI at all times relevant. (DFOF ¶ 2). Her duties included providing mental health services to offenders under the professional direction of a licensed psychologist. (DFOF ¶ 3).

On May 18, 2007, defendant Fischer saw the plaintiff in her office as he was having thoughts of committing suicide and was afraid that he would "end up dead." (DFOF ¶ 5). According to Fischer, the plaintiff made statements concerning depression such as feeling helpless, hopeless, empty, and "numb" and he also made statements of suicidal thoughts, including having constant thoughts of death and believing that it was only a matter time until he was going to kill himself. *Id.* The plaintiff then reported that the previous week, he had attempted to smother himself with a plastic bag to "test" himself. *Id.* He also stated that he did not suffocate because there were holes in the plastic bag he did not notice. *Id.*

---

[1] This section is taken from the Defendants' Proposed Findings of Fact (DFOF) and the Plaintiff's Response to the Defendants' Proposed Findings of Fact (PRDFOF). Facts are also taken from the Plaintiff's Proposed Findings of Fact (PFOF). Facts are undisputed unless otherwise indicated.

Facts are included to the extent that they are relevant to the claim upon which the plaintiff is proceeding in this case - an Eighth Amendment conditions of confinement claim that he was subjected to cold temperatures while confined in cell A226 in the Health and Segregation Complex at Waupun Correctional Institution from May 18-21, 2007. While other conditions he was subjected to during that time - i.e., guards kicking on his cell door, constant low wattage illumination, limited access to toilet paper - are relevant in establishing the context of his overall conditions during that time, they are not independent claims. *See Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (summary judgment stage "is too late in the day to be adding new claims").

The plaintiff disputes portions of the defendants' version of his May 18, 2007 conversation with defendant Fischer. According to the plaintiff, he did not threaten to harm himself in any way, did not convey any plan or intent to commit suicide, and did not act in any threatening or inappropriate manner. (PRDFOF ¶ 5; PFOF ¶¶ 8-11). However, the plaintiff acknowledges that he did discuss his history of struggles with suicide and his habit of smothering himself with plastic bags. (PRDFOF ¶ 5; PFOF ¶ 7).

After speaking with and evaluating the plaintiff, defendant Fischer concluded that, given the risk of potential self harm, he needed to be placed in clinical observation status. (DFOF ¶ 6). Pursuant to DAI Policy #311.00.01, clinical observation is a non-punitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or others. (DFOF ¶ 7). Any property that an inmate can use to injure himself is removed. *Id.* Fischer's primary concern was the plaintiff's safety and prevention from self-inflicted harm and, under the circumstances, it was necessary to limit his property to a black mat and suicide smock. (DFOF ¶ 10). In Fischer's clinical judgment, the plaintiff was a serious suicide risk, justifying the preventative measures that were taken. *Id.* Although Fischer had no knowledge of the temperatures outside or inside of the institution at any time relevant to this matter, she would not have allowed the plaintiff to have a blanket because of his recent suicidal thoughts and behaviors. (DFOF ¶ 13; PFOF ¶¶ 23-24).

A security smock is a sleeveless garment which covered the plaintiff from his upper torso to his mid-thigh. (PFOF ¶ 40). The rubber mat is about one-inch thick and made of "a hard, unbendable black tire-like material." (PFOF ¶ 41). Before the plaintiff was placed in cell A226, he was stripped naked and given only the security smock to wear. (PFOF ¶ 43). He was confined to cell A226 twenty-four hours a day, from May 18-21, 2007. (PFOF ¶ 44).

Defendants Jeremy Staniec, Josh Mason, and Marc Medema are Correctional Officers at WCI; defendants Craig Paltz and Thomas Core are Supervising Officers 2 (Captains) at WCI; and defendants Daniel Braemer and Brian Greff are Supervising Officers 1 (Lieutenants) at WCI. (DFOF ¶¶ 23-26). Defendants Staniec, Mason, Medema, Paltz, Core, Braemer, and Greff were all working in the Health and Segregation Complex (HSC) at WCI at various times between May 18 and May 21, 2007; during that time period, the plaintiff asked each of them at some point if he could have a blanket and some other personal hygiene items. (DFOF ¶¶ 27-30). The plaintiff alleges that he asked for a blanket because he was "shivering and shaking uncontrollably from the freezing temperature in the cell." (DFOF ¶ 31). Defendants Staniec, Mason, Medema, Paltz, Core, Braemer, and Greff all denied the plaintiff's request because they are not authorized to permit an inmate in clinical observation, as the plaintiff was, additional property. (DFOF ¶ 33). This can only be done by PSU staff. *Id.*

Defendants Paltz, Core, Braemer, and Greff have reviewed the Booster Coil (BC) 66 temperature log from May 18, 2007, through May 21, 2007, which is the booster coil that feeds heat into cell A226. (DFOF ¶ 32). Based on their review of this log, the average temperature in the plaintiff's cell was 73.6 degrees, with a low temperature of 70.23 degrees and a high temperature of 75 degrees. *Id.*

The plaintiff disputes the reliability of the BC 66 temperature log in reporting the accurate temperature in cell A226. (PRDFOF ¶ 32). He asserts that between May 18 and May 21, 2007, the defendants did not have an accurate way of measuring the temperature in the cell because the temperature measuring probe, which is the only means of measuring the temperature in the cell, is located three feet deep inside the exhaust vent (three feet beyond the face/grill-front of the vent) and the little holes that form the openings of the face/grill-front of the vent were over 90% obstructed with what looked like a brown paper bag material. *Id.* The air temperature of a cell is measured through the exhaust vent and temperature is affected (air exchange is reduced) when the vents are covered or obstructed. *Id.* The plaintiff's complaints of cold temperatures were not isolated – the person housed in the neighboring cell also experienced cold temperatures, and that inmate had access to blankets, sheets, pants, and socks. (*Id.*; Declaration of Law by DeJuan Walker ¶¶ 2-6). The plaintiff clarifies that defendants Paltz, Core, Braemer, and Greff did not check the temperature of the plaintiff's cell during the times that he was actually confined to the cell. (PRDFOF ¶ 32). While housed in cell A226, the

-6-

plaintiff felt at times as if he were standing outside almost naked in 10-degree weather. *Id.* He avers that the cold temperatures he experienced between May 18 and May 21, 2007, were harsh and unbearable. *Id.*

According to the plaintiff, a few hours after being placed in cell A226 on May 18, 2007, he began to feel a noticeable chill in the room. (PFOF ¶ 45). Walking around the room to keep warm, he notified defendant Staniec that it was starting to get "cold as hell in here." *Id.* Staniec did not check the temperature of the cell nor did he contact any PSU staff to determine whether the plaintiff should be provided with a blanket. (PFOF ¶ 55). During the night of May 18, 2007, after the plaintiff pressed the Medical Emergency button and complained of the freezing temperature in the cell, defendant Paltz looked into his cell and asked how he was doing. (PFOF ¶ 59). The plaintiff explained that he could not stop shaking from the cold temperature. *Id.* He asked Paltz to turn the heat on in his cell and that he be provided with a blanket. (PFOF ¶ 60). Paltz responded that he could not control the heat and he refused to provide the plaintiff with a blanket. (PFOF ¶ 61). During the night of May 18, 2007, Paltz did not check the temperature of cell A226. (PFOF ¶ 62). That night, when the plaintiff attempted to lay or sit on the bed area in the cell, he could feel a steady breeze of cold air blowing on him. (PFOF ¶ 66). As a result, he dragged the one-inch mat on the floor to attempt to escape the continuous cold air. *Id.* During the late night of May 18 and early morning of May 19, 2007, the plaintiff explained to defendant Medema that he could not stop shaking from the cold

-7-

and that he needed a blanket to keep warm, but Medema failed to provide the plaintiff with a blanket. (PFOF ¶¶ 67-68). Medema did not contact any PSU staff to determine whether the plaintiff should be provided with a blanket nor did he check the temperature of the plaintiff's cell. (PFOF ¶¶ 70-71). In an attempt to ward off the cold, the plaintiff curled into a ball, but even in such a position he shuddered from the freezing temperatures. (PFOF ¶ 74). On May 19, 2007, during the day, the plaintiff explained to defendant Braemer that he could feel cold air blowing out of the vent and that it was freezing in the cell. (PFOF ¶ 75). He asked Braemer for a blanket and for something to be done about the cold air blowing out of the vent. *Id.* Braemer failed to provide the plaintiff with a blanket and did not check the temperature in the plaintiff's cell. (PFOF ¶ 76). On May 19, 2007, the plaintiff explained to defendant Mason that he was freezing in the cell and that he needed a blanket. (PFOF ¶ 84). Mason did not provide the plaintiff with a blanket nor did he contact any PSU staff to determine whether the plaintiff should be provided with a blanket. (PFOF ¶¶ 85-90). In an attempt to generate some of his own body heat, the plaintiff paced barefoot around the cell, but the floor was so cold that it became unbearable to walk on with bare feet. (PFOF ¶ 91). On May 19, 2007, the plaintiff explained to defendant Greff that he was freezing and could not sleep because it was so cold. (PFOF ¶ 92). The plaintiff asked for "something, anything" to cover up and keep warm but Greff failed to provide the plaintiff with anything. (PFOF ¶¶ 92-93). On May 19, 2007, Greff never checked the temperature of the plaintiff's cell nor

-8-

Case 2:07-cv-00919-JPS   Filed 09/09/09   Page 8 of 16   Document 82

did he contact any PSU staff to determine whether the plaintiff should be provided with a blanket. (PFOF ¶ 94). On May 20, 2007, the plaintiff demonstrated to defendant Core that he was freezing by showing him his shaking arm and that he could not stop shaking because it was so cold. (PFOF ¶¶ 107-08). The plaintiff asked Core for a blanket "or anything" to keep warm but Core failed to provide him with a blanket. (PFOF ¶ 109). In another attempt to generate his own body heat, the plaintiff vigorously rubbed his arms and rocked back and forth, but such movements were disorienting, as the plaintiff was also severely sleep deprived. (PFOF ¶ 110). Every fifteen minutes a unit staff member approached either the front of the cell door or the observation window to look at the plaintiff. (PFOF ¶ 118). Whenever the plaintiff would begin physically shaking and shivering uncontrollably from the cold, he would curl up into a ball on the mat on the floor. (PFOF ¶ 119). Whenever he would curl up into a ball, unit staff members would bang and kick on the door demanding that he move an arm or leg or some party of his body to demonstrate that he was still breathing. *Id.*

Defendant Gary Ankarlo is employed as a Psychologist Supervisor Doctorate at WCI. (DFOF ¶ 15). His duties include, under the general supervision of the Deputy Warden, responsibility for the overall administration of the PSU at WCI. (DFOF ¶ 16). Dr. Ankarlo also provides psychological services to offenders, makes recommendations for institutional programming, assists in providing training to staff, and participates with other PSU staff in structured case conferences and staffing.

-9-

*Id.* Dr. Ankarlo was not the plaintiff's treating psychologist; he supervised the plaintiff's treating physician. (DFOF ¶ 17). He did not have any direct contact with the plaintiff. (DFOF ¶ 18). It is the professional responsibility of PSU staff to take the steps necessary to prevent a suicidal inmate from harming himself or any other person. (DFOF ¶ 19). A black mat and suicide smock were provided to the plaintiff, and Ankarlo agreed with Fischer's decision to not allow any additional property, such as a blanket. (DFOF ¶ 20). Dr. Ankarlo also has no knowledge of what the temperatures were outside or inside of the institution at all times relevant to this matter. (DFOF ¶ 21). However, the plaintiff was allowed the only property deemed clinically appropriate at that time. *Id.*

Defendant Michael Thurmer is employed by DOC as Warden of WCI. (DFOF ¶ 39). He is responsible for the overall administration and operation of WCI and has the responsibility at the institution level for implementing all DOC policies and directives and legislative and judicial mandates. (DFOF ¶ 40). In this position, Thurmer is a custodian of the regularly conducted business records of WCI and is familiar with policies applicable to WCI and the general operation of this institution. (DFOF ¶ 41). Although Thurmer has general supervisory authority over WCI operations as provided in the Wisconsin Statutes, he does not supervise the day-to-day operations of medical personnel within WCI. (DFOF ¶ 42). Thurmer does not and is not qualified to provide medical and psychological services to inmates at WCI. (DFOF ¶ 43). Such diagnostic and treatment services are provided

-10-

to inmates by the WCI HSU and WCI PSU. *Id.* Thurmer exercises no control over or input into HSU and PSU staff medical/psychological diagnostic and treatment decisions, and relied on the professional judgment of Fischer and Ankarlo based on their evaluations and consultations regarding the plaintiff. *Id.* Thurmer had no personal involvement with the plaintiff's medical or mental health care. (DFOF ¶ 45).

## ANALYSIS

The defendants contend that: (1) defendants Ankarlo and Thurmer should be dismissed for lack of personal involvement; (2) the plaintiff's allegation of "freezing temperatures" in his cell is not serious enough to violate the Eighth Amendment; and (3) they are entitled to qualified immunity. The plaintiff contends that the totality of the conditions violated his Eighth Amendment rights because the conditions were objectively serious and the defendants were indifferent to his basic human needs. He also argues that the defendants are not entitled to qualified immunity.

**1.     Personal Involvement**

Section 1983 creates a cause of action against "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Since a section 1983 action is against a "person," in order "[t]o recover damages under § 1983, a plaintiff must establish that a defendant was

personally responsible for the deprivation of a constitutional right." *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995)). To be personally responsible, an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Johnson*, 444 F.3d at 583-84 (quotation omitted).

There is no respondeat superior liability under § 1983; a plaintiff must demonstrate that supervisory officials are personally responsible for alleged deprivations. *See Monell v. Dep't of Social Serv's*, 436 U.S. 658, 694 (1978); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). Supervisory officials may be personally responsible for the constitutional torts of their subordinates only if the official knows of and facilitates, approves, condones, or turns a blind eye to the conduct. *See Chavez v. Cady*, 207 F.3d 901, 906 (7th Cir. 2000); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

In this case, it is undisputed that defendants Ankarlo and Thurmer were not personally involved in the plaintiff's complaint allegations. Rather, they supervised the defendants personally involved in his claims. Since there is not supervisory liability under § 1983, these defendants are not liable based on their positions. *See Antonelli*, 81 F.3d at 1428. Accordingly, defendants Ankarlo and Thurmer will be dismissed for lack of personal involvement.

-12-

## 2. Eighth Amendment Claim

To prevail on an Eighth Amendment claim based on inadequate prison conditions, the plaintiff must show that: (1) the conditions in the prison were objectively "sufficiently serious so that a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities"; and (2) prison officials acted with deliberate indifference to those conditions. *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (internal citations and quotation marks omitted). Prisoners have an Eighth Amendment right to adequate shelter, including a right to protection from cold. *See Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). To assess whether cold cell temperatures constitute cruel and unusual punishment, courts must consider factors including: "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id.* at 644; *see also Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999) (finding that exposure to extreme cold for seventeen hours could constitute Eighth Amendment violation); *Henderson v. DeRobertis*, 940 F.2d 1055, 1058 (7th Cir. 1991) (finding that deprivation of blankets for four days in extreme cold could constitute Eighth Amendment violation). The cold need not present an imminent threat to the inmate's health to implicate the Eighth Amendment. *See Dixon*, 114 F.3d at 642.

In this case, it is undisputed that the plaintiff was placed in clinical observation after telling a prison psychologist that he placed a plastic bag over his head. Although the parties dispute what exactly was said at the meeting between the plaintiff and defendant Fischer, it is undisputed that after this meeting Fischer decided to place the plaintiff in clinical observation for his own safety based on potential risk of suicide.

After being stripped naked and given a security smock to wear and a black mat to sleep on, the plaintiff was placed in cell A226. He had running water and was occasionally provided with several thin squares of toilet paper, but not enough to avoid having to use his bare hand to wipe himself after having a bowel movement. Officers checked on the plaintiff frequently, sometimes kicking the cell door until the plaintiff moved. The plaintiff was placed in cell A226 on May 18, 2007, and he remained there twenty-four hours per day until May 21, 2007. It is undisputed that, according to the BC 66 temperature log, the average temperature in cell A226 from May 18-21, 2007, was 73.6 degrees, with a low temperature of 70.23 degrees and a high temperature of 75 degrees.

The plaintiff disputes the accuracy of the BC 66 temperature log. He does not allege that the system was not functioning but rather he asserts that because the temperature measuring probe is located three feet inside the exhaust vent and because the face of the exhaust vent is about 90% obstructed, the measuring probe does not accurately gauge the temperature within the cell. The plaintiff avers that

-14-

Case 2:07-cv-00919-JPS   Filed 09/09/09   Page 14 of 16   Document 82

he was freezing cold for the four days he spent on clinical observation, that cold air was blowing into his cell and it felt like it was about 10 degrees Fahrenheit. He avers that he was shaking uncontrollably, pacing in his cell to keep warm, and curled up in a ball to try to keep warm. The plaintiff has submitted evidence in the form of an affidavit of another inmate who was in a nearby cell and asserts that it was indeed cold, although that inmate had clothes to wear and a blanket with which to cover up.

The parties' disagreement over the severity of the cold arguably presents a genuine issue of material fact as to whether the duration and severity of the cold in the plaintiff's cell was serious enough to implicate the Eighth Amendment. *See Dixon*, 114 F.3d at 643 (question of whether "the severity of the cold, in combination with the length of time which the inmate had to endure it, was sufficient to violate the Eighth Amendment is one which will often be peculiarly appropriate for resolution by the trier of facts"); *see also Lewis v. Lane*, 816 F.2d 1165, 1166, 1171 (7th Cir. 1987); *Flores v. O'Donnell*, 36 Fed. Appx. 204, 207 (7th Cir. 2002) (unpublished).

The defendants do not argue the deliberate indifference prong of the plaintiff's Eighth Amendment claim. They do not have much to argue in this regard because the undisputed facts reveal that the plaintiff repeatedly asked for clothes or a blanket and each request was denied. The correctional officers whom he asked say that they lacked authority to give him additional property because he was on clinical status and that such decision had to come from the PSU. But it is undisputed that the defendants did not check with the PSU to see if he could be provided with a

blanket. The risk of self-harm very well may have justified not giving the plaintiff a blanket. However, a factfinder could infer that the defendants were deliberately indifferent by failing to respond to the barely-clothed plaintiff's repeated complaints of extreme cold in his cell. *See Dixon*, 114 F.3d at 643 (failure by prison officials to respond to complaints about cell conditions can demonstrate deliberate indifference).

Finally, the defendants argue that they are entitled to qualified immunity. However, the right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort was well established in 1986. *See Del Raine v. Williford*, 32 F.3d 1024, 1034 (7th Cir. 1994). Accordingly, the defendants are not entitled to summary judgment on the basis of qualified immunity. Therefore,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #41) is **GRANTED IN PART AND DENIED IN PART** as described herein.

**IT IS FURTHER ORDERED** that defendants Ankarlo and Thurmer are **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 9th day of September, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge